IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JOHN DOE,<br>c/o Engel & Martin, LLC<br>4660 Duke Drive, Ste 101<br>Mason, OH 45040<br><br>Plaintiff,<br><br>v.<br><br>ANN JAMES<br>Director, Miami University Office of<br>Community Standards<br>9 Warfield Hall<br>451 E. Spring St.<br>Oxford, OH 45056<br><br>LARISSA MARPLES<br>Assistant Director, Miami University Office<br>of Community Standards<br>9 Warfield Hall<br>451 E. Spring St.<br>Oxford, OH 45056<br><br>WESLEY HIGHLEY<br>Title IX Investigator, Miami University<br>Office of Community Standards<br>9 Warfield Hall<br>451 E. Spring St.<br>Oxford, OH 45056<br><br>KENYA D. ASH<br>Director, Office of Equity and Equal<br>Opportunity<br>Hanna House<br>219 E. Spring St.<br>Oxford, OH 45056<br><br>Defendants | Case No. 1:19-cv-136<br><br>Judge<br><br>COMPLAINT |

1

## INTRODUCTION

1. Plaintiff John Doe brings this action for a declaratory judgment and injunctive relief under 42 U.S.C. §1983.

2. This case arises out of the decision of the Miami University to proceed with a disciplinary hearings against John Doe in violation of his constitutional rights.

## PARTIES

3. Plaintiff John Doe ("Doe") is an undergraduate student at Miami University.

    a. John Doe is a New York resident with a residence at [OMITTED]. Doe has completed four semesters of coursework at Miami University.

    b. John Doe was scheduled to graduate from his program with a Bachelor's Degree in Finance. However, John Doe has taken a medical leave of absence and is not present at Miami University during the Spring 2019 semester.

    c. The disclosure of John Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

4. Defendant Ann James ("James") is the Director of the Miami University Office of Community Standards. She has a principal place of business at 9 Warfield Hall, 451 E. Spring St., Oxford, OH 45056.

    a. James is sued in her official capacity for declaratory and injunctive relief.

    b. On information and belief, James has been acting under the policies, procedures, and practices of Miami University and, in particular, those policies designed to implement Title IX.

c. James is responsible for administering and operating the Miami University Code of Student Conduct.

5. Defendant Larissa Marples ("Marples") is the Assistant Director of the Miami University Office of Community Standards. She has a principal place of business at 9 Warfield Hall, Oxford, OH 45056-3629.

    a. Marples is sued in her official capacity for declaratory and injunctive relief.

    b. On information and belief, Marples has been acting under the policies, procedures, and practices of Miami University and, in particular, those policies designed to implement Title IX.

6. Defendant Wesley Highley ("Highley") is a Title IX Investigator for the Miami University Office of Community Standards. He has a principal place of business at 9 Warfield Hall, Oxford, OH 45056-3629.

    a. Highley is sued in his official capacity for declaratory and injunctive relief.

    b. Highley is sued in his individual capacity for damages.

    c. On information and belief, Highley has been acting under the policies, procedures, and practices of Miami University and, in particular, those policies designed to implement Title IX.

7. Defendant Kenya Ash ("Ash") is the Director of the Office of Equity and Equal Opportunity. She has a place of business at 219 E. Spring St. Oxford, OH 45056.

    a. Ash is sued in her official capacity for declaratory and injunctive relief.

    b. Ash is responsible for administering and operating the Miami University Code of Student Conduct.

c. On information and belief, Ash has been acting under the policies, procedures, and practices of Miami University and, in particular, those policies designed to implement Title IX.

8. On information and relief, Defendants James and Ash are authorized to grant all of the injunctive relief sought in the Complaint.

## JURISDICTION AND VENUE

9. This case arises, in part, under the laws of the United States, specifically 42 U.S.C. §1983 and §1988. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

10. The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

11. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendants are residents of the state in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

### THE MIAMI UNIVERSITY RESPONSE TO THE ISSUE OF SEXUAL MISCONDUCT ON CAMPUSES

12. Defendant Miami University is a public university created by the Ohio Legislature. Miami University has a principal place of business at 501 E. High St., Oxford, OH 45056.

    a. Based on Fall 2018 enrollment, Miami University has approximately 21, 799 students, including 17,147 undergraduates. Miami University also has regional campuses in Hamilton, Middletown, and West Chester.

    b. The Miami University Board of Trustees is the governing body of Miami University. The Board of Trustees consists of 11 members—nine voting members and two student

nonvoting members. The nine voting members are appointed one each year for nine-year terms by the governor of Ohio, with advice and consent of the Senate. The two student nonvoting members are appointed for two-year staggered terms by the governor, with advice and consent of the Senate.

13. After years of criticism for being too lax on campus sexual assault, colleges and universities are relying on Title IX to crackdown on alleged perpetrators. Unfortunately, this crackdown has gone too far. Problems include: accused students effectively are presumed guilty; instead of requiring accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.

14. On April 11, 2011, the U.S. Education Department, Office of Civil Rights ("OCR") sent a "Dear Colleague" to colleges and universities.

    a. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

    b. Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt."

    c. The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

    d. The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

    e. The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

    f. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

15. Observers on both the left and the right noted that this led colleges to eliminate due process protections for accused students in order to create the appearance of being tough on the problem. Caroline Kitchens, *Overreaching on Campus Rape*, National Review, May 13, 2014 ("Because of the inadequacy of campus courts and lack of procedural safeguards in place to protect students, this has grave consequences for due process"); Emily Yoffe, *The College Rape Overreaction*, Slate Dec. 7, 2014 ("Colleges, encouraged by federal officials, are instituting solutions to sexual violence against women that abrogate the civil rights" of accused students). The procedures adopted by schools have received substantial criticism from this Court. For example:

> Sexual assault is a deplorable act of violence… Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

16. External pressure from the federal government and lawsuits brought by private parties caused Miami University to increase the zealousness of its "prosecution" of sexual assault and the harshness of the sanctions it imposed. *See Doe v. Miami University Univ.*, 882 F.3d 579, 593-594 (6th Cir.2018). The Association of Title IX Administrators published "2014 Whitepaper" entitled *Equity is Such a Lonely Word*, includes training materials presented to college Title IX departments and states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and *victims are typically women*, equity may require institutions to recalibrate the pendulum to right the historical imbalance."

17. On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). In withdrawing the Dear Colleague Letter, OCR observed that prior actions

    > may have been well-intentioned, but… led to the deprivation of rights for many students — both accused students denied fair process and victims denied an adequate resolution of their complaints.

    *Id.* at 1-2. OCR further said:

    > Legal commentators have criticized the [Dear Colleague Letter]… for placing 'improper pressure upon universities to adopt procedures that do not afford fundamental fairness.' [As a result, many schools have established procedures for resolving allegations that] lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.

    *Id.*, quoting *Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

18. On November 16, 2018, the Department of Education circulated for notice and comment new regulations to implement Title IX. The new regulations seek to narrow the definition of sexual harassment and increase protections for students accused of misconduct. The proposed regulations would require schools to investigate sexual assault and harassment only if the alleged misconduct was reported to certain campus officials and only if it occurred on campus or other areas overseen by the school.

19. Miami University has been the subject of three investigations by OCR related to the handing of sexual misconduct allegations. OCR Docket 15-16-2200; OCR Docket 15-17-2066; OCR Docket 15-17-2122.

20. Miami University has adopted certain policies and procedures for the investigation and adjudication of alleged sexual misconduct, as required by Title IX.

21. One set of policies and procedures are found in the "Sexual Misconduct Policy and Procedures for Students at Miami University 2018-2019" ("Sexual Misconduct Policy"). A copy of the Sexual Misconduct Policy is Attached as Exhibit A. The Policy Indicates it was revised in July 2018.

22. The Sexual Misconduct Policy states that Miami University is committed to "Processes for reliable and impartial investigation and adjudication that include appropriate disciplinary sanctions for those who commit Title IX violations, including suspension and dismissal."

23. The Sexual Misconduct Policy acknowledges, perhaps grudgingly, the rights of accused student. The Sexual Misconduct Policy provides:

    > It must be recognized that the accused in a University investigation has legal and other rights and that complaints in which each of the parties are members of the campus community are ethically and legally complex. A presumption of responsibility should not be made as the result of any allegations.

24. The Sexual Misconduct Policy operates separate and independent from any criminal investigation. The policy provides:

    > Students who believe they have experienced sexual misconduct or interpersonal violence may report both to the University's Deputy Title IX Coordinator and pursue criminal charges against the person or persons they believe to have committed the crime. A criminal charge and a University investigation may be pursued at the same time.

25. Sexual misconduct under the Sexual Misconduct Policy includes sexual assault.

    a. Sexual assault is defined as "any sexual act directed against another person, without their consent, including instances where the person is incapable of giving consent."

    b. Consent under the Sexual Misconduct Policy is defined as "when a person agrees or gives permission to another person to engage in certain sexual acts." The Sexual Misconduct Policy further explains, "Consent is a knowing and voluntary verbal or non-verbal agreement between both parties to participate in each and every sexual act."

8

26. The Sexual Misconduct Policy states that Miami University "is committed to addressing" alleged violations of the Sexual Misconduct Policy "in a prompt and equitable manner." The Sexual Misconduct further suggests that the investigatory and adjudicatory process typically "will take approximately 60 calendar days." However, this is not a hard deadline and may vary, according to the Sexual Misconduct Policy based on not only the "complexity of the investigation" but also on factors such as holidays or breaks.

27. Reports alleging sexual misconduct are, in most instances, investigated by the Office of Community Standards.

    a. The Sexual Misconduct Policy promises "a prompt, fair and impartial investigation of the report."

    b. The investigation is conducted by persons who receive training on issues related to Title IX violations and on conducting investigations. On information and belief, much of the training is done by an organization called the National Center for Higher Education Risk Management ("NCHERM"), or organizations associated with that organization. NCHERM is a for-profit organization formed to support the marketing efforts of attorneys who operate in this field. The organization is very media savvy in regards to self-promotion, but none of the principals appear to have any law enforcement investigatory experience. The Association of Title IX Administrators ("ATIXA") is associated with NCHERM.

    c. On information and belief, the investigators at Miami University have no experience in conducting law enforcement investigations or investigations into allegations of sexual assault. Instead, most have a background in employment-related or education-related investigations, including matters of discrimination, harassment, and occupational safety

and health. Rarely have investigators worked as a prosecutor or other law enforcement officer.

28. The Sexual Misconduct Policy permits an accused student to be accompanied by an "advisor," during meetings or proceedings. The advisor may be an attorney, but the role is strictly limited. The Sexual Misconduct Policy provides: "The role of the advisor is only to be present to advise; they will not be provided documentation or permitted to interject…".

29. An accused student is permitted to submit a written statement and other information, including the names of possible witnesses.

30. The purpose of the investigation is not to determine whether the accused committed sexual misconduct. Instead, the investigator is charged with determining "whether reasonable cause exists to believe a Title IX violation occurred and what responses need to occur."

31. If the investigator believes that an accused student "poses an imminent threat of harm or disruption to the campus community," the matter is referred to the Dean of Students, who may initiate a the summary suspension process to immediately remove the student from campus and/or impose other restrictions.

32. During the investigation, the complainant may receive accommodations and benefits, referred to as "Remedial Actions" or "Support Services."

    a. Interim measures can include "no contact" orders and changes in academic, employment or living arrangements.

    b. These benefits and accommodations would not be available to students but for the fact that the students claimed to have been a victim of sexual misconduct. On information and belief, these benefits and accommodations are not disclosed to the accused student or described in the investigation, despite the potential impact on the credibility of the witnesses who receive the benefits or accommodations.

33. Disciplinary hearings for violations of the Sexual Misconduct Policy are held before an Administrative Hearing Panel consisting of two faculty and one staff member.
    a. The hearings are conducted by people who receive annual training on issues related to Title IX violations and on conducting a hearing process. The training includes information on evidence, procedural rules and conflicts of interest. The training also includes substantive topics such as the "dynamics and impacts of domestic violence, dating violence, sexual assault, stalking and sexual harassment" and "trauma reactions."
    b. At the hearing, an accused student is permitted to file a written statement, submit information and present relevant witnesses.
    c. An accused student may have a "support person" and an "advisor (including an attorney or advocate) of their choice" present during the hearing. The support person and advisor may not interject or participate during the disciplinary hearing.
34. Whether a student is "responsible" for a violation of the Sexual Misconduct Policy is determined under a "preponderance" standard. The Sexual Misconduct Policy explains, "This determination is based on the greater weight of the information and does not require a standard beyond a reasonable doubt."
35. Sanctions for violations of the Sexual Misconduct Policy include dismissal, suspension, removal from campus housing, educational intervention, no-contact orders and/or restrictions from participating in intercollegiate athletics or co-curricular activities.
36. Both the complainant and the accused student have the right to appeal. Appeals are limited, however, to "alleged procedural error, new information and/or inappropriate sanction."
37. The policies, procedures, and sanctions outlined in the Code of Student Conduct apply to all violations of the Sexual Misconduct Policy. (A copy of the Procedures Section of the Code of Student Conduct is attached as Exhibit B.)

38. The Code of Student Conduct provides that the investigation will be conducted by Office of Student Conduct.

    a. During the investigation, an accused student may file a written statement, submit information and identify relevant witnesses.

    b. At the conclusion of the investigation, the investigator will prepare a report summarizing the relevant evidence collected during the investigation and including a determination as to whether or not reasonable cause exists to believe a violation occurred. A copy of the investigative report is provided to the members of the hearing panel.

39. The Code of Student Conduct provides additional guidance for hearings.

    a. While a hearing is supposed to "commence no sooner than five University working days after delivery of the charge to the accused…" an accused student "may request a postponement of the hearing for reasonable cause."

    b. During the hearing, an accused student may file a written statement or a written response to the complaint. The accused student may also submit information and question witnesses who testify in the matter.

    c. During the hearing, an accused student may not be represented by counsel. Instead, the accused student may have an "advisor." The Code of Student Conduct provides, "The role of the advisor is only to be present; they will not be provided documentation or permitted to interject during the meeting."

40. The Code of Student Conduct does not address situations where there are simultaneous criminal and university investigations.

41. The Sexual Misconduct Policy and the Code of Student Conduct do not provide that if an accused student exercises his/her right to remain silent, then the silence may not be used against the accused student. In practice, if a student does not appear and present testimony and evidence at

a disciplinary hearing, the student will almost certainly be found "responsible" and subject to significant discipline.

## THE FALL 2018 INCIDENT

42. John Doe is facing a disciplinary hearing at Miami University for events that allegedly occurred beginning on the evening of November 18, 2018 (the "Incident").

43. The alleged victim, referred to here as "Jane Roe," alleges that on the night of the Incident, John Doe initiated sexual activity with her while she was asleep.

44. Jane Roe told the Miami University investigator the following:

    a. Jane Roe had been invited to a fraternity semi-formal.

    b. Jane Roe was provided drinks by John Doe. She said, "I was drunk but wasn't sloppy."

    c. Jane Roe left the party with John Doe and went back to his room. Jane Roe alleges that she fell asleep on John Doe's bed. She later indicated that when she woke up John Doe's "penis was inside her."

    d. Jane Roe alleged that she did not consent to sexual activity with John Doe. She alleges that she pushed John Doe off of her and ran to the bathroom to contact her friends, telling them that she had been raped.

    e. Jane Roe later went to the hospital and had a SANE examination.

45. Jane Roe contacted the Oxford, Ohio police.

    a. The Oxford police started an investigation into possible sexual assault by John Doe and obtained a search warrant for John Doe's room.

    b. John Doe declined to give a statement to the Oxford Police.

46. On November 19, 2018, Jane Roe made a complaint of sexual misconduct to Miami University. The Office of Community Standards started an investigation. Highley was the investigator.

47. John Doe declined to give a statement to the Office of Community Standards.

a. On November 29, 2018 John Doe told Highley via an email he has retained counsel and has "been advised not to make any statements regarding these allegations at this time." John Doe added that he would be willing to provide a statement once "any criminal inquiries are closed."

b. On November 29, 2018 Highly responded to John Doe that the investigation would proceed without John Doe's statement. He wrote,

> You are under no obligation to submit a statement. Thank you for clarifying your current intentions and understanding of the circumstances surrounding the potential criminal matter. I must continue my investigation per the University protocol…

48. On or about December 6, 2018 John Doe was given an opportunity by Highley to provide comments on a draft of the Investigative Report. John Doe indicated that because of the criminal investigation "I am unfortunately not able to provide comments at this time (though I do have comments."

a. John Doe offered to provide a statement when the criminal investigation was resolved.

b. John Doe asked that Miami University delay issuing a final report until the criminal investigation was resolved. He wrote to Highley:

> [G]iven that my criminal case is still pending, I would respectfully ask that your final report be delayed until such time as the potential criminal case is resolved. Once the criminal case is resolved I will be able to fully participate in the investigative process, which will allow me to present my side of the story.

c. John Doe asked for assurances that his exercise of his right to remain silent would not be held against him.

   i. He wrote to Highley, "I would respectfully ask that you do not hold my silence against me in your investigation, as my silence is 100% related to the possible criminal case."

14

ii. Highley responded, "The Title IX investigation process is prompt, fair and impartial for both the complainant and the accused; I do not hold your silence against you nor can I reasonably delay the delivery of an investigation report pending a criminal case's uncertain timeline or outcome."

49. The Investigative Report was completed on December 10, 2018.

    a. The Investigative Report found "reasonable cause to proceed with disciplinary charges" against John Doe.

    b. The Investigative Report concluded that Jane Roe "was incapable of giving consent for multiple reasons; [Jane Roe] was both intoxicated and asleep at the time of the alleged assault."

    c. The Investigative Report observed that John Doe "waived his right to comment pending the outcome of the criminal investigation." The Investigative Report further noted that the "unopposed facts available… corroborate that [John Doe] initiated and engaged in non-consensual sexual intercourse with [Jane Roe]…"

50. On December 12, 2018 Marple sought to schedule a "procedural review" with John Doe in order to discuss the disciplinary process.

    a. John Doe requested that because he could not "make any statements at this time" that "the hearing process be delayed until the criminal process is complete." Marple refused this request. She wrote, "I definitely understand where you are coming from! However, since our process is not dependent on the criminal process, we are going to continue moving forward."

    b. John Doe also requested that "If the matter is set for an Administrative Hearing,… the panel be instructed that they cannot draw any inferences from my silence." Marples did not respond to this request.

51. On December 13, 2018 John Doe indicated to Marples that he would not be able to attend the procedural review meeting because it would be "recorded and subject to subpoena" and, again, requested that the process be stayed pending a resolution of the criminal investigation. Marple declined the request to delay the disciplinary process:

> I definitely understand and respect your decision, but due to the timeline we are held to, we cannot hold off indefinitely. Again, we could potentially work with postponing if we had a more definite timeline, but if not, we will need to continue moving forward. When we have reports come in at the end of a semester, it is always our goal to have the hearing before the next semester begins to ensure we are doing our due diligence to all parties so they can know how to plan for their future.

52. On February 5, 2019 John Doe received a letter from the Hearing Coordinator for the Office of Community Standards. John Doe was informed that a hearing had been scheduled for February 15, 2019. John Doe has requested a continuance of the hearing because of conflicts, including a doctor's appointment. Miami agreed.

53. On February 21, 2019 John Doe was informed that a hearing had been re-scheduled for March 1, 2019. He was informed of the members of the hearing panel and given an opportunity to submit any objections.

    a. John Doe was informed that he had to provide to the Office of Community Standards the following before 5:00 on February 25, 2019:

        1. A list of witnesses you intend to present to provide information to the Hearing Panel.

        2. Any supporting documents you want the Hearing Panel to consider that are not already included in the Investigation Report including, but not limited to, audio recordings, social media messages/postings (Facebook, Twitter, Instagram) police reports, photographs, videos, etc.

        3. Any written statements you want the Hearing Panel to consider including, but not limited to, statement of the complainant or the accused.

54. The Defendants' continued actions against John Doe are causing substantial, immediate, and continuing damages. Suspension, expulsion or other discipline from Miami University will cause

John Doe to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.

### COUNT I
### (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)

55. Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

56. This Count is brought against the Individual Defendants.

57. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself."

58. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

59. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

60. Miami University has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

61. John Doe is entitled under the Constitution of the United States to the opportunity to be heard in a meaningful manner at the disciplinary hearing.

62. John Doe's interests in the results of the disciplinary hearing are significant.

    a. Suspension from Miami University would deny him the benefits of education at his chosen school.

    b. Suspension and other sanctions would also damage John Doe's academic and professional reputation.

c. Suspension and other sanctions are likely to affect the John Doe's ability to enroll at other institutions of higher education and to pursue a career.

63. The Defendants have violated John Doe's due process rights in the following manner:

    a. Miami University is seeking to impose a penalty on John Doe for asserting his Fifth Amendment privilege against self-incrimination. The Constitution limits the imposition of any sanction which makes assertion of the Fifth Amendment privilege costly.

    b. Miami University is forcing John Doe to choose between waiving his right to remain silent or waiving his right to defend himself at the Administrative Hearing.

        i. Discipline by Miami University would deny John Doe the benefits of education at his chosen school, damage his academic and professional reputations, and affect his ability to enroll at other institutions of higher education and to pursue a career.

        ii. Miami University has a limited interest in delaying the Administrative Hearing until the completion of the criminal proceedings, especially since John Doe will not be present on the campus during the Spring 2019 semester.

        iii. The risk of error in the process moving forward when John Doe asserts his right to remain silent is relatively high. John Doe has not been assured that his silence will not be used against him and he is not permitted by Miami University rules from having an attorney ask questions on his behalf or present evidence.

64. The Plaintiff and the Individual Defendants acting in their official capacity have a dispute about whether the Sexual Misconduct Policy and the Code of Student Conduct, as applied to John Doe, violates the Due Process Clauses of the United States Constitution.

65. The Individual Defendants have both a duty to enforce the provisions of the Sexual Misconduct Policy and the Code of Student Conduct and have actually enforced those provisions against John Doe.

66. John Doe is entitled to a declaration that the Sexual Misconduct Policy and Code of Student Conduct, as applied to John Doe, violates the Due Process Clauses of the United States Constitution.

67. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
### (42 U.S.C. §1983 -- VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)

68. Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

69. This count is brought against the Individual Defendants in their Official Capacity for injunctive relief.

70. This count is brought against the Individual Defendants in their individual capacity for damages.

71. The Defendants have acted under color of law in violating the Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitutions.

72. The Defendants have acted intentionally and with callous disregard for the Plaintiff's clearly established constitutional rights.

73. As a direct and proximate result of the Defendants' violations of the Plaintiffs' constitutional rights, John Doe, in the absence of injunctive relief will suffer severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

74. The Defendants continued actions against the Plaintiff under the Miami University Code of Student Conduct are causing substantial, immediate, and continuing damage to the Plaintiffs.

75. Pursuant to 42 U.S.C. §1983, the Plaintiff is entitled to an Injunction from this Court prohibiting the imposition of, or reporting of, any disciplinary actions under the Miami University Code of Student Conduct against the Plaintiff.

76. Pursuant to 42 U.S.C. §1988, the Plaintiff is entitled to his attorney's fees incurred in bringing this action.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests the following relief:

- Judgment in favor of Plaintiff and specifically, on Count I, declaring that the Sexual Misconduct Policy and Code of Student Conduct, as applied to John Doe, violates the Due Process Clauses of the United States Constitution.
- An Injunction prohibiting further disciplinary proceedings in a manner that violates the Due Process Clauses of the United States Constitution.
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

Respectfully submitted,

/s/ Joshua A. Engel
Joshua Adam Engel (0075769)
Anne Tamashasky (0064393)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com